GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
MEGAN M. BERGSTROM (Cal. Bar No. 228289)
Email: bergstromm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>     vs.<br><br>NOTIS GLOBAL, INC. (f/k/a MEDBOX, INC.), VINCENT MEHDIZADEH, BRUCE BEDRICK, YOCELIN LEGASPI, and NEW-AGE INVESTMENT CONSULTING, INC.,<br><br>               Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

1   78u(d)(3)(A), 78u(e) & 78aa(a).

2        2.    Defendants have, directly or indirectly, made use of the means or

3   instrumentalities of interstate commerce, of the mails, or of the facilities of a national

4   securities exchange in connection with the transactions, acts, practices and courses of

5   business alleged in this complaint.

6        3.    Venue is proper in this district pursuant to Section 22(a) of the Securities

7   Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a),

8   because certain of the transactions, acts, practices and courses of conduct constituting

9   violations of the federal securities laws occurred within this district.  In addition,

10  venue is proper in this district because defendant Mehdizadeh resides in this district

11  and defendant Notis Global, Inc. (f/k/a Medbox, Inc.) ("Medbox") is headquartered in

12  and/or does business in this district.

## SUMMARY

13

14       4.    This enforcement action concerns a scheme to inflate defendant

15  Medbox's reported revenues through sham transactions with an undisclosed affiliate.

16  From 2012 to 2014, Medbox was a self-described leader in the marijuana consulting

17  industry.  It also purported to sell "Medbox" devices – vending machines capable of

18  dispensing marijuana on the basis of biometric identification.  Vincent Mehdizadeh

19  was Medbox's founder, chief operating officer, and majority shareholder.  Bruce

20  Bedrick was the company's chief executive officer.

21       5.    Mehdizadeh carried out the scheme in a series of steps.  He formed a

22  shell company called New-Age Investment Consulting, Inc. ("New-Age") and

23  installed his fiancée, co-defendant Yocelin Legaspi, as its putative chief executive

24  officer.  At the end of 2012, he transferred 226,000 Medbox shares under his control

25  to New-Age.  He then drafted bogus documentation to paper up the transaction and

26  create the false appearance that New-Age had paid or provided services valued at

27  $552,000 when in truth, New-Age had paid nothing for those shares.  Mehdizadeh

28  next caused New-Age, in short order, to sell the 226,000 Medbox shares through

COMPLAINT                                      2

transactions that ultimately resulted in the shares being sold into the public market, despite the fact that the shares were restricted securities not eligible for public sale. New-Age reaped more than $3.1 million from these sales and quickly funneled that money back to Medbox and Mehdizadeh by:  (i) paying Medbox $1.37 million in exchange for an assignment of Medbox accounts receivable that New-Age never subsequently collected; (ii) further capitalizing Medbox by paying $1 million for another 100,000 shares of restricted Medbox stock; and (iii) funding, through a $640,000 transfer to a real estate escrow account, Mehdizadeh's personal acquisition of a Pacific Palisades home.  The $1.37 million New-Age paid to Medbox for its questionable accounts receivable enabled Medbox to report revenues that were far rosier than its operational reality.  Revenues from the New-Age accounts receivable deal comprised 22% and 65% of Medbox's reported revenue in 2012 and the first quarter of 2013, respectively.

6.     A year later, Mehdizadeh again used New-Age to inflate Medbox's reported revenue.  In February 2014, New-Age sold 50,000 of its remaining Medbox shares for $1.1 million.  Within a month, Mehdizadeh caused New-Age to funnel those proceeds back to Medbox, ostensibly in exchange for:  dispensary "management rights" that Medbox did not actually own; equipment associated with a marijuana cultivation build-out that never occurred; and the exclusive right to place Medbox machines in Denver, Colorado, notwithstanding the fact that New-Age had no dispensary license in Denver, and no reasonable prospect of obtaining one, either. Bogus revenues from these transactions, which Medbox falsely described in SEC filings as transactions with a "non-affiliated shareholder," amounted to nearly 90% of Medbox's reported revenue in the first quarter of 2014.

7.     In concert with this scheme, Medbox issued press releases touting, among other things, its "record" revenue numbers, thus legitimizing Medbox as a viable commercial operation.  This false track record of operating revenue distinguished Medbox from other companies in the burgeoning marijuana industry at

the time, an outcome no doubt intended by defendants.  As Mehdizadeh put it in a text message to Bedrick, "the only thing we are really good at is public company publicity and stock awareness.  We get an A+ for creating revenue off sheer will but that won't continue."

8.      Bedrick, for his part, was complicit in Mehdizadeh's scheme to inflate Medbox's revenues.  Faced with repeated and clear indicia of Mehdizadeh's malfeasance, Bedrick took no action and abdicated his governance responsibilities as Medbox's CEO.  Bedrick authorized Medbox's issuance of shares to New-Age in 2013 despite knowing that Mehdizadeh was a principal of New-Age.  And in 2014, Bedrick conceded that one of the deals transacted between Medbox and New-Age – from which Medbox derived significant reported revenue – made no economic sense from New-Age's perspective.  Bedrick himself referred to New-Age as Mehdizadeh's company, and when confronted with a third-party's accusation that Mehdizadeh was illegally issuing Medbox shares through shell entities controlled by him, Bedrick said in an email to Mehdizadeh, "[I] told you this guy knows more than you think."

9.      Bedrick's refusal to confront Mehdizadeh proved to be personally profitable.  In the period of time that New-Age was artificially inflating Medbox's reported revenue, Bedrick unloaded over 710,000 of his Medbox shares in private placements or public sales, reaping $6,483,180 in total sales proceeds.  Mehdizadeh likewise enriched himself through the fraud, selling more than 950,000 of his own Medbox shares for $6,014,048 in sales proceeds.  In connection with these sales, both Bedrick and Mehdizadeh signed, as sellers, stock purchase agreements falsely claiming that the company's SEC filings contained no misrepresentations.

10.      Following a fall 2014 internal investigation by a special committee of Medbox's board of directors, the company restated its financial statements for 2012, 2013, and the first nine months of 2014.  Medbox reversed, among other things, all New-Age associated revenue for the years 2012 and 2013 and the first quarter of 2014.  Mehdizadeh was later ousted from the company.

11.     By engaging in this conduct:  (i) Medbox, Mehdizadeh and Bedrick violated the antifraud provisions of the Securities Act and the Exchange Act; (ii) Bedrick and Mehdizadeh misled the company's auditors in violation of Rule 13b2-2 of the Exchange Act; (iii) Bedrick falsely certified Medbox's SEC filings in violation of Rule 13a-14 of the Exchange Act; (iv) Medbox violated the reporting provisions of the Exchange Act, with Mehdizadeh and Bedrick aiding and abetting those violations; (v) Medbox violated the books and records and internal controls provisions of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, with Mehdizadeh aiding and abetting those violations; (vi) Medbox, Mehdizadeh, New-Age and Legaspi violated the securities registration provisions of Section 5 of the Securities Act; and (vii) Mehdizadeh violated the broker-dealer registration provisions of Section 15 of the Exchange Act.

12.     With this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws, disgorgement of defendants' ill-gotten gains along with prejudgment interest, an order requiring defendants to pay civil penalties, an officer and director bar against defendants Mehdizadeh and Bedrick, a penny stock bar against defendants Mehdizadeh and Bedrick, and an order requiring Bedrick to reimburse Medbox his stock compensation in accordance with Section 304 of the Sarbanes-Oxley Act ("SOX").

## THE DEFENDANTS

13.     Medbox, now known as Notis Global, Inc., is a Nevada corporation with its principal place of business in Los Angeles, California.  In January 2014, Medbox filed a Form 10 with the SEC in order to register its common stock under Section 12(g) of the Exchange Act.  That Form 10 went effective in March 2014, and thereafter, Medbox began filing periodic reports with the SEC in accordance with Section 13(a) of the Exchange Act and related rules thereunder.

14.     Vincent Mehdizadeh, age 38, resides in Pacific Palisades, California. Mehdizadeh held a succession of positions at Medbox:  senior consultant, from

December 2012 to May 10, 2013; chairman of the board and chief operating officer, from May 10, 2013 to April 10, 2014; acting principal financial officer, from October 1, 2013 to February 13, 2014; senior strategist and founder, from April 10, 2014 to October 13, 2014; and founder and senior advisor, from October 13, 2014 to January 21, 2015.

15.     Bruce Bedrick, age 48, resides in Delray Beach, Florida.  Bedrick was Medbox's chief executive officer from December 2011 through July 2014, and a member of the company's board of directors from December 2011 through August 2014.  He continued to act as a consultant to the company until the end of October 2014.

16.     Yocelin Legaspi, age 37, is a resident of Los Angeles, California. Legaspi was Mehdizadeh's fiancée.

17.     New-Age is a California corporation that Mehdizadeh formed in July 2012.  Within days of forming New-Age, Mehdizadeh installed Legaspi as the company's nominal chief executive officer, secretary, and chief financial officer.

## THE ALLEGATIONS

**A.     Mehdizadeh and Bedrick Take Control of Medbox**

18.     Medbox's securities were publicly traded.  Medbox filed financial statements with the OTC from November 2011 to April 2014, and was quoted on the OTC Pink tiered marketplace, and later on the OTCQB marketplace, under the ticker symbol, MDBX, until January 28, 2016, when the company changed its name to Notis Global, Inc.  Notis Global, Inc.'s stock is publicly-traded, and is now quoted on the OTC Pink Sheets market under the symbol NGBL.

19.     In the relevant period, Medbox's stock price was volatile – between August 2012 and December 2014, its stock ranged in price from a low of $2.50 to an all-time high of $205 per share.

20.     At points in time during the relevant period, Medbox shares were a penny stock, meaning that the securities were issued by a small company and trading

at less than $5 per share.

21.     Medbox provided consulting services to clients seeking to obtain marijuana dispensary licenses in jurisdictions where dispensaries were legal under state law.

22.     Medbox was initially incorporated as Rabatco, Inc., and later became Mindfuleye, Inc.

23.     In August 2011, Mindfuleye, Inc. changed its name to Medbox.  In December 2011, Medbox acquired Prescription Vending Machines, Inc. ("Prescription Vending Machines"), a company owned by Mehdizadeh.

24.     Prescription Vending Machines provided consulting services to those seeking to operate marijuana dispensaries in state jurisdictions where such dispensaries were legal. Mehdizadeh's consulting services included building out dispensaries for clients.

25.     Mehdizadeh had also developed a machine, called the "Medbox," which dispenses marijuana on the basis of biometric identification.  Mehdizadeh claimed to sell Medbox machines to some clients for installation in their dispensaries.

26.     Through two transactions – one in November 2011, the other in August 2012 – Mehdizadeh gained control of Medbox by buying the majority of its outstanding shares from one of its prior directors, who departed from the company in August 2012.

27.     In all, Mehdizadeh purchased more than 10.8 million shares of Medbox's common stock and 3 million shares of Medbox's preferred stock.

28.     Medbox hired Bedrick as its chief executive officer in December 2011. Bedrick was a trained chiropractor.  He had also partnered with Mehdizadeh, in the past, to obtain dispensary licenses in the state of Arizona.

**B.     Medbox's and Mehdizadeh's Scheme to Inflate Revenue through New-Age's Improper Sale of Restricted Medbox Shares**

29.     From July 2012 to May 2015, defendants Medbox and Mehdizadeh

engaged in a scheme to inflate Medbox's reported revenues through sham transactions with a shell company formed by Mehdizadeh, all financed by the undisclosed and improper sale of restricted Medbox shares.

30.     Mehdizadeh knew that this was all a fraudulent scheme to inflate Medbox's revenue.

**1.     In 2013, Medbox reports bogus revenue using proceeds from New-Age's illegal stock sales**

31.     Mehdizadeh formed New-Age in July 2012.  Five days later, he installed Legaspi – his fiancée at the time – as the company's chief executive officer, corporate secretary, and chief financial officer.

32.     Mehdizadeh took no official title with the company.  He nonetheless controlled New-Age.

**a.     Mehdizadeh transfers Medbox shares to New-Age for no consideration**

33.     As part of his August 2012 stock purchase agreement, Mehdizadeh acquired 226,000 shares of Medbox stock from a former Medbox director, which were being held in the name Spiro Marketing, Inc. ("Spiro").  Spiro had been formed and controlled by the former Medbox director.

34.     Although it was Mehdizadeh who purchased the Medbox shares held in the name of Spiro, Mehdizadeh never officially transferred those shares to his own name.  Instead, he transferred the shares directly from Spiro to New-Age on December 31, 2012, in order to hide his true ownership of the shares.

35.     To make this stock transfer appear legitimate, Mehdizadeh drafted a phony stock purchase agreement, consulting services agreement, promissory note, and a promissory note release.

36.     These documents created the false impression that New-Age had either paid $552,000 for the Medbox shares, or that it had provided $552,000 worth of services to Spiro in exchange for the stock.

37.   New-Age never paid any amount of cash for the 226,000 Medbox shares.

38.   New-Age never provided any services, or anything else of value, to Spiro in exchange for the 226,000 Medbox shares.

39.   In fact, New-Age did not have the financial wherewithal to purchase the 226,000 Medbox shares at the time.  The company had no bank account prior to January 2013, and even after opening an account, New-Age's bank balance was only $54 as of the end of that month.

40.   At the end of 2012, Medbox's stock was trading at about $61.00 per share, making the 226,000 shares that Mehdizadeh transferred to New-Age, for no consideration, worth nearly $13.8 million.

### b.   New-Age sells the Medbox shares for $3.1 million

41.   From February to April 2013, New-Age sold all 226,000 of its Medbox shares to four purchasers in private transactions.  Each of these sales was made at a significant discount to Medbox's market price, at prices ranging from $11.50 to $22.80 per share.

42.   For each of the sales, New-Age executed purchase agreements which falsely stated that it was not an affiliate of Medbox or that the Medbox shares being sold were free-trading shares.

43.   New-Age reaped sales proceeds of more than $3.1 million in connection with these private sales.

44.   Mehdizadeh actively coordinated New-Age's sale of the Medbox shares to the four purchasers, communicating with some of the purchasers and a broker purporting to advise New-Age on not only deal terms, but the content of attorney opinion letters provided by New-Age to the purchasers of its Medbox stock.

45.   Among other things, Mehdizadeh caused opinion letters and other documents to be distributed to buyers which falsely represented that New-Age had paid $552,000 in consideration for its Medbox shares, and which further disavowed

any affiliation between New-Age and Medbox.

46.    Bedrick knew, or was reckless or negligent in not knowing, of Mehdizadeh's involvement in New-Age's Medbox stock sales.  For example, Bedrick learned in a January 2013 email that Mehdizadeh was reviewing a term sheet between New-Age and a potential buyer for the restricted Medbox shares that Mehdizadeh had transferred to New-Age for no consideration, despite Mehdizadeh's purported non-involvement with the company.

47.    The four purchasers who bought the Medbox shares from New-Age eventually sold the shares into the public market.  However, the shares were restricted securities and thus not eligible for public sale.

### c.    New-Age redirects the $3.1 million in sales proceeds back to Medbox and Mehdizadeh

48.    Once the $3.1 million in stock sales proceeds were deposited into New-Age's corporate bank account, Mehdizadeh quickly caused the funds to be transferred back to himself and Medbox.  This took place in three steps:  (i) New-Age paid Medbox $1 million for another 100,000 shares of restricted Medbox stock; (ii) New-Age paid Medbox $1,371,000 million for doubtful Medbox accounts receivable (which New-Age subsequently never collected); and (iii) New-Age sent $640,000 to an escrow account to fund Mehdizadeh's acquisition of a luxury home in the Pacific Palisades.

49.    As a result of the foregoing transactions – a $1 million Medbox stock purchase, the $1.37 million accounts receivable sale, and the $640,755 Mehdizadeh took for his house – New Age's corporate bank account was depleted by the end of April 2013.  This was so in spite of the company having just collected $3.1 million through its illegal public sale of the 226,000 restricted Medbox shares, shares that Mehdizadeh had surreptitiously transferred to New-Age, for no consideration, at the end of 2012.

### i.     New-Age buys Medbox stock

50.     In one January 17, 2013 stock purchase agreement, New-Age agreed to purchase 100,000 shares of Medbox at $10 per share.

51.     In a second January 17, 2013 stock purchase agreement, New-Age agreed to purchase another 71,429 shares of Medbox at $70 per share.

52.     In the entire course of Medbox's history, no shareholder had ever purchased restricted, private placement shares at anything near $70 per share.

53.     Bedrick executed a board resolution authorizing Medbox to issue 171,429 restricted shares to New-Age.

54.     He did so notwithstanding the fact that New-Age had not actually paid for the shares, and notwithstanding his knowledge that a $70 per share price was unprecedented for Medbox.  This was contrary to Medbox's general practice, in which Bedrick would not authorize shares for issuance until funds were actually transferred by a buyer.

55.     Taken together, the two New-Age stock agreements were for 171,429 shares, for an aggregate purchase price of $6,000,030.

56.     On February 19, 2013 Medbox issued a press release touting a "$6 million equity transaction" with a "private investment firm" that "specializes in funding up and coming companies."

57.     Mehdizadeh drafted the February 19, 2013 press release, and Bedrick reviewed and approved it.

58.     In the release, Bedrick claimed that this "$6 million equity transaction" would provide Medbox with the capital to pursue acquisition opportunities and boost its revenue in the company's existing market segments.

59.     The company's claims of a "$6 million equity transaction" were misleading because New-Age – the alleged "private investment firm" – never invested $6 million in Medbox.  In fact, at the time of the press release, Bedrick had authorized the issuance of Medbox shares to New-Age without obtaining any

COMPLAINT                                          11

confirmation that New-Age could pay for the shares.

60.    Ultimately, New-Age purchased only $1 million in Medbox stock, and paid Medbox for those shares in February and March 2013.

61.    The February 19, 2013 press release also stressed that the "$6 million equity transaction" was a long-term investment by an unnamed "private investment firm," which would provide Medbox with a more traditional source of funding, in contrast to a capital raise through the sale of founder's shares.  Indeed, the release took care to emphasize that Mehdizadeh had not "liquidated" any of his shares into the public market.

62.    All of this was a sham.  New-Age was not a "private investment firm" nor was it a traditional source of funding in the form of a long-term investor.  In reality, New-Age was merely a shell company under the direct control of Mehdizadeh.

63.    Nor was it true that Mehdizadeh had not "liquidated" his own Medbox stock through public market sales.  New-Age was only able to buy shares from Medbox in February and March 2013 because it was raising money (in that very same two-month period) through its own sale of Medbox shares.  But those Medbox shares were actually the shares Mehdizadeh had paid for and transferred to New-Age for no consideration at the end of 2012.  Those 226,000 shares were then sold into the public market by New-Age's buyers since New-Age had falsely represented to them in stock purchase agreements that the shares were not restricted and were freely tradeable.

64.    Mehdizadeh was the architect of this sham financing transaction.

65.    Bedrick likewise knew, or was reckless or negligent in not knowing, that Mehdizadeh was closely affiliated with New-Age and that there was no true, arms-length "$6 million equity transaction" with a "private investment firm."  He also knew, or was reckless or negligent in not knowing, that this transaction was really just a sale of Medbox shares to a company controlled by Mehdizadeh which did not have the financial means to invest $6 million.

66.     For example, in mid-January 2013, Bedrick wrote Mehdizadeh an email and emphasized, in reference to New-Age, "That is your company.  That's your fiancée."  Mehdizadeh wrote back and asked Bedrick if he wanted to go forward with the deal.  Bedrick replied, "Its [sic] not that I don't want to do the deal … but how did your ex fiancée get 6 mill to invest in us?"

67.     Bedrick further knew, or was reckless or negligent in not knowing, that one month earlier, in January 2013, Mehdizadeh had been directly involved in New-Age's sale of other Medbox shares, and that the so-called "$6 million equity transaction" was being at least partially funded by proceeds from those other Mehdizadeh-orchestrated stock sales.

68.     In March 2013, Bedrick point-blank told Mehdizadeh in an email that "ultimately people are going to know who gave us that 6 million.  In fact I have received the most amount of flack from the lack of transparency of the company committed to the 6 mill."

69.     Yet when a Medbox investor asked Bedrick to provide more detail about the purported "$6 million equity transaction," Bedrick misleadingly told the investor in an email that the money came from a "small private company" that "really loves us."

### ii.     New-Age buys Medbox's questionable receivables for $1.37 million

70.     In March and April 2013, New-Age paid $1.37 million to Medbox to ostensibly have 13 of Medbox's purported accounts receivable assigned to New-Age.

71.     The receivables generally arose from Medbox's contracts with customers to secure dispensary licenses, to build out dispensaries, and for the sale of Medbox machines.

72.     Contrary to what one would expect in an arms-length accounts receivable financing transaction, New-Age paid Medbox full value for every one of the accounts receivable, rather than at a discount.

73.    New-Age's $1.37 million purchase of accounts receivable from Medbox was never documented in a written contract.

74.    New-Age performed no due diligence on the accounts receivable.

75.    Further, New-Age's decision to purchase these accounts receivable made little sense from New-Age's standpoint.  Many of the receivables were either subject to contracts expressly prohibiting their assignment.  Or they arose from contract rights that had expired as of the time that New-Age purchased them in March and April 2013 because the contracts contained terms stating that they lapsed after one-year.

76.    Medbox recognized that $1.37 million as revenue in violation of Generally Accepted Accounting Principles ("GAAP").

77.    In nearly every case, Medbox treated New-Age's payments as a credit to each of the accounts receivable sold.  These false entries were recorded as if the $1.37 million in payments on accounts receivable had been made by the customers associated with the receivables, rather than New-Age, a shell entity controlled and funded by Mehdizadeh.

78.    No revenue could have been recognized by Medbox under GAAP for any of the customer contracts underlying the accounts receivable that had been assigned to New-Age.

79.    For each of the 13 customer contracts underlying the accounts receivable purchased by New-Age, revenue recognition was prohibited under GAAP for at least one of the following reasons:  (i) Medbox had entered into a settlement agreement cancelling the customer's obligation to pay; (ii) having not received a dispensary license, the customer was entitled to a refund and its contract with Medbox was cancelled; (iii) Medbox never delivered the Medbox machines called for by the customer's sales contract; (iv) with the customer having ceased operations, the customer's contract entitled it to a full refund; and/or (v) Medbox never built out the dispensary called for by the customer's contract.

80.    Mehdizadeh knew, or was reckless in not knowing, that the receivables sold to New-Age were in fact uncollectible.  He drafted or signed the contracts that gave rise to each of the purported receivables and also communicated with each of the Medbox customers about problems with the contracts.

81.    Medbox recognized $1.37 million in total revenue on the customer contracts corresponding to the accounts receivable sold to New-Age in the spring of 2013.  Specifically, $561,000 was recognized in the year ended December 31, 2012, and $810,000 was recognized in the first quarter of 2013.

82.    The $561,000 in reported revenue for the year ended December 31, 2012 constituted 22% of Medbox's annual revenue that year.  The $810,000 in reported revenue in the first quarter of 2013 constituted 65% of Medbox's revenue for that quarter.

83.    None of the $1.37 million in total revenue for the contracts underlying the accounts receivable sold to New-Age should have been recognized under GAAP.

84.    Medbox's SEC and OTC filings did not indicate that this purported revenue had actually been realized through New-Age's purchase, at full value, of Medbox's uncollectible accounts receivable.

85.    Despite paying $1.37 million for them, New-Age never collected any of the amounts owed on Medbox's 13 accounts receivable.

86.    Following this course of events, Medbox swiftly issued three press releases in April and May 2013 touting its revenue results, exclaiming that the company was "proud to report that Q1 2013 was its highest revenue quarter in the company's history," and describing those results as a company "record."

### iii.    New-Age pays $640,755 to fund the purchase of Mehdizadeh's home

87.    In March 2013, Mehdizadeh caused the transfer of $640,000 in funds from New-Age to an escrow account in connection with his acquisition of a luxury home in the Pacific Palisades.

88.     New-Age also paid another $755 for inspection work related to the house purchase.

**2.      In 2014, Medbox reports bogus revenues through additional sham transactions with New-Age**

89.     In April 2013, Medbox had filed a Form 10 with the SEC to register its common stock under Section 12(g) of the Exchange Act.  Medbox withdrew that filing in June 2013 prior to it becoming effective.

90.     In January 2014, Medbox filed another Form 10 with the SEC to register its common stock under Section 12(g) of the Exchange Act.

91.     That Form 10 went effective in March 2014, and consequently, Medbox's first quarter 2014 Form 10-Q would be the company's first quarterly SEC filing since becoming a reporting company.

92.     Over the course of the prior year, Medbox, Mehdizadeh, and Bedrick had repeatedly represented that becoming a reporting company would mark a significant step forward for Medbox's business.

93.     In a July 17, 2013 press release, for example, Bedrick claimed that Medbox's filing of a Form 10 (the one later withdrawn) "allows us to once again demonstrate that we are the leader and one of only a few legitimate companies catering to the medical marijuana ancillary service industry."

94.     As Medbox planned to file another Form 10 in 2014 (the one which ultimately went effective), Medbox issued another press release on March 26, 2014 in which Mehdizadeh represented that the filing was "further evidence of our goal to maintain the highest standards for corporate governance and transparency … It is of special importance to me personally that we are one of the only fully reporting public companies that has generated considerable revenues … and demonstrated an executable business plan."

95.     Accordingly, Medbox's revenues for the first quarter of 2014 were of particular concern to management, including Mehdizadeh and Bedrick.

96.     Prior to Medbox's filing of its first quarter 2014 Form 10-Q, Bedrick responded to concerns from Mehdizadeh about the declines in stock prices in the marijuana sector by saying in a text message "Its [sic] a culling.  We are going to need revenues and deals."

97.     Mehdizadeh was determined to make it appear that Medbox had first quarter revenue to report.  And so Mehdizadeh once again utilized New-Age to fabricate Medbox revenue out of whole cloth in violation of GAAP.

98.     Through two sham transactions – the "Benson" deal and the "Denver" deal (described in more detail below) – Medbox reported $1.15 million in first quarter 2014 revenue in connection with contracts entered into with New-Age.

99.     Just as it had done in 2013, New-Age funded the Benson and Denver deals with proceeds from the sale of Medbox stock.

100.    In February 2014, New-Age sold 50,000 shares of Medbox stock in a private transaction for a total of $1,113,000.

101.    Within a month of receiving those sales proceeds, New-Age began to funnel that money back to Medbox as payments in the two sham transactions.

**a.     The Benson deal**

102.    First, Mehdizadeh caused New-Age to pay Medbox $500,000 in exchange for 50% of the management rights to a dispensary located in Benson, Arizona, and another $150,000 in exchange for equipment needed for a cultivation build out at that dispensary.

103.    However, Medbox did not own the management rights it purported to sell New-Age, and a cultivation facility was never built at the Benson dispensary.

104.    With that contract in place, Medbox recognized $650,000 in first quarter 2014 revenue.

105.    Medbox falsely described this deal as a transaction with a "non-affiliated shareholder" in its first quarter 2014 Form 10-Q.

106.    Medbox also failed to accurately disclose the relationship between

Medbox, Mehdizadeh, and New-Age in its related party disclosures in its first quarter 2014 Form 10-Q.

107.   That $650,000 in first quarter 2014 revenue should not have been recognized under GAAP because:  (i) Medbox didn't actually own the management rights it purported to sell to New-Age; and (ii) Medbox never built out a cultivation facility at the Benson dispensary.

108.   In addition, Mehdizadeh repeatedly lied to the Medbox finance employees who were reviewing the deal, and in a text message accused them of "looking to harpoon our Q1 results."

109.   Those finance employees questioned Mehdizadeh about the Benson management rights, seeking proof that Medbox actually owned those rights.  In response, Mehdizadeh lied by preparing an inter-office memo that falsely described earlier payments by Medbox for the rights, telling Medbox's finance employees in an email that it was "preposterous" not to recognize revenue from the Benson deal in the first quarter of 2014.

### b.    The Denver deal

110.   Second, Mehdizadeh caused New-Age to enter into a contract with Medbox in which Medbox purportedly transferred to New-Age an exclusive right to place Medbox machines in the Denver, Colorado market, and further agreed to assist New-Age in obtaining dispensary licenses in Denver.

111.   Under the contract, New-Age agreed to pay Medbox $500,000 upfront for its exclusivity rights, and would pay an additional $100,000 for each dispensary license New-Age obtained in the Denver market.  New-Age paid Medbox approximately $400,000 toward this contract.

112.   The Denver deal made little economic sense.  It required New-Age to pay a substantial upfront sum for the supposedly exclusive right to install Medbox machines in Denver, even though New-Age owned no dispensaries in Denver, had no license to operate a dispensary in Denver, and had no guarantee that it would ever be

1   able to break into the Denver market.

2        113.   Mehdizadeh described it in an email as a "sweet deal" because Medbox

3   had done "zero work" in Denver and the $500,000 was Medbox's money whether or

4   not it ever obtained any licenses for New-Age.

5        114.   In the end, New-Age never obtained a Denver dispensary license and

6   never ordered any Medbox machines for delivery in Denver.

7        115.   Notwithstanding this, Medbox recognized $500,000 in first quarter 2014

8   revenue in connection with the Denver deal.

9        116.   Medbox falsely described this deal as a transaction with a "non-affiliated

10   shareholder" in its first quarter 2014 Form 10-Q.

11        117.   Medbox also failed to accurately disclose the relationship between

12   Medbox, Mehdizadeh, and New-Age in its related party disclosures in its first quarter

13   2014 Form 10-Q.

14        118.   That $500,000 in first quarter 2014 revenue should not have been

15   recognized under GAAP because it stemmed from a sham transaction that lacked

16   economic substance.

17        119.   Between the Benson and Denver deals, Medbox reported $1.15 million

18   in first quarter 2014 revenue in violation of GAAP.  These bogus revenues

19   constituted 89% of the total revenue reported by Medbox for the quarter.

20        120.   Days after the end of the quarter, Mehdizadeh confided in Bedrick that:

21   "The only thing we are really good at is public company publicity and stock

22   awareness.  We get an A+ for creating revenue off sheer will but that won't

23   continue."

24        121.   In a May 15, 2014 press release, Medbox publicized its first quarter

25   2014 revenue, touting those results as a marked increase over its revenue in the same

26   period in 2013.  With that financial performance as a backdrop, Bedrick represented

27   in the press release that, "We continued to establish the company as the leader in the

28   rapidly growing legitimate marijuana industry while increasing our transparency to

the investment community and position in the capital markets."

### 3.     Medbox issues misleading press releases in furtherance of the scheme

122.   After inflating Medbox's reported revenues, Mehdizadeh and the company issued a series of misleading press releases designed to maximize the price impact of Medbox's bogus financial results.

123.   For example, in press releases dated April 15, 2013, July 1, 2013, July 17, 2013, August 20, 2013, January 13, 2014, March 10, 2014, March 26, 2014, and May 15, 2014, the company pressed the illusion that Medbox's corporate governance was strong, and that its operations and financial performance were transparent.  They also insisted, time and again, that these attributes made Medbox unique among its competitors in the marijuana industry.  These statements and omissions were misleading since senior management at Medbox had in fact been engaging in undisclosed related party transactions, for the express purpose of materially inflating its reported revenues in violation of GAAP.

124.   Among other statements, Bedrick represented that:

a.     "Going forward, Medbox will literally be an open book, with verifiable contracts, revenue, and share count information, in stark contrast to other companies in our sector."  (4/15/2013 press release.)

b.     "[W]e are the leader and one of only a few legitimate companies catering to the medical marijuana ancillary service industry."  (7/17/2013 press release.)

c.     "Our effort in becoming the most credible marijuana ancillary services public company has paid off for Medbox and its shareholders.  Quarter after quarter we post solid revenue numbers, have an ever expanding business model, and we are the first company in the sector with a working business model …"  (8/20/2013 press release.)

d.     "Much of the investor interest in Medbox has occurred through financial press, financial media, and general media coverage chronicling advances in

the medical marijuana industry, an industry in which we feel we are the most reputable company." (1/13/2014 press release.)

        e.    "We continued to establish the company as the leader in the rapidly growing legitimate marijuana industry while increasing our transparency to the investment community and position in the capital markets." (5/15/2014 press release.)

125.    Mehdizadeh was similarly quoted in Medbox press releases as saying:

        a.    "We are light years ahead in all phases on being a transparent company, and the standard for all companies operating in the medical marijuana ancillary service industry to emulate." (7/1/2013 press release.)

        b.    "Some of the public companies in the marijuana sector are in the business of self-promotion with little or no substance or even an executable business plan. Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times ... and also demonstrated profitability." (1/13/2014 press release.)

        c.    "It is of special importance to me personally that we are one of the only fully reporting public companies that has generated considerable revenues in the marijuana ancillary services sector and demonstrated an executable business plan … These key differences set us apart from our competitors." (3/26/2014 press release.)

126.    Based on the foregoing conduct, Medbox and Mehdizadeh engaged in a scheme to materially inflate Medbox's reported revenues in violation of GAAP through sham transactions with New-Age. As part of the scheme, they then publicized Medbox's bogus results to much fanfare, all in an effort to create the illusion that Medbox was unique among its competitors in the marijuana industry for having generated tangible revenue, and for having maintained a strong and transparent corporate governance environment. Medbox and Mehdizadeh carried out these deceptive acts in order to prop up the price of Medbox's volatile, thinly-traded

1   stock in the nascent marijuana industry.

2   **C.    The Defendants' Material Misrepresentations and Omissions**

3         127.   Medbox, Bedrick, and Mehdizadeh made materially false and

4   misleading representations and omissions in Medbox's filings with the SEC and

5   OTC, and in its publicly-disseminated press releases.

6         128.   As alleged in detail below, Medbox:  (i) fraudulently overstated its

7   revenues for the years ended 2012, 2013, and the first quarter of 2014 in OTC and

8   SEC filings; (ii) misleadingly omitted material facts about the New-Age receivables

9   purchase, Benson deal, and Denver deal in OTC and SEC filings; (iii) fraudulently

10  overstated its revenues in multiple press releases issued during the relevant time

11  period; (iv) made material misrepresentations and omissions about the New-Age

12  financing transaction in Medbox's February 19, 2013 and March 8, 2013 press

13  releases; and (v) made material misrepresentations and omissions about the

14  company's accounts receivable collections in Medbox's April 2 and April 15, 2013

15  press releases.

16        **1.     Fraudulently overstated revenues and material omissions about New-**

17              **Age in Medbox's SEC and OTC filings**

18        129.   New-Age's 2013 purchase of Medbox's uncollectible accounts

19  receivable and the Benson and Denver deals in 2014 resulted in the company

20  fraudulently overstating its revenues for the years ended 2012 and 2013, and in the

21  first quarter of 2014.

22        130.   In a Form S-1 filed by Medbox with the SEC on July 15, 2013, Medbox,

23  Bedrick, and Mehdizadeh materially overstated Medbox's annual revenues in 2012

24  and first quarter revenue in 2013.  Medbox's 2012 revenue was fraudulently inflated

25  by $561,000, or nearly 16% of the 2012 revenue reported by the Form S-1 filing.

26  Medbox's first quarter 2013 revenue was fraudulently inflated by $810,000, or 46%

27  of the first quarter 2013 revenue reported by the Form S-1 filing.

28        131.   The July 15, 2013 Form S-1 filing also falsely described the New-Age

receivables transaction as a purchase of receivables by a "shareholder" and failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

132.   In a Form S-1/A filed by Medbox with the SEC on November 13, 2013, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012.  Medbox's 2012 revenue was fraudulently inflated by $561,000, or nearly 16% of the 2012 revenue reported by the Form S-1 filing.

133.   The November 13, 2013 Form S-1/A filing also failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

134.   In a Form 10 filed by Medbox with the SEC on January 21, 2014, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012.  Medbox's 2012 revenue was fraudulently inflated by $561,000, or 22% of the 2012 revenue reported by the Form 10 filing.

135.   The January 21, 2014 Form 10 filing also failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

136.   In a Form 10/A filed by Medbox with the SEC on March 31, 2014, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012 and 2013.  Medbox's 2012 revenue was fraudulently inflated by $561,000, or 22% of the 2012 revenue reported by the Form 10/A filing.  Medbox's 2013 revenue was fraudulently inflated by $810,000, or 15% of the 2013 revenue reported by the Form 10/A filing.

137.   The March 31, 2014 Form 10/A filing also failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

138.   In a Form 8-K filed by Medbox with the SEC on April 3, 2014 that attached a press release about Medbox's financial statements, Medbox and

Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012 and 2013. Medbox's 2012 revenue was fraudulently inflated by $561,000, or 22% of the 2012 revenue reported by the Form 8-K filing. Medbox's 2013 revenue was fraudulently inflated by $810,000, or 15% of the 2013 revenue reported by the Form 8-K filing.

139.   In a filing made with the OTC on April 3, 2014, Medbox and Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012 and 2013. Medbox's 2012 revenue was fraudulently inflated by $561,000, or 22% of the 2012 revenue reported by the OTC filing. Medbox's 2013 revenue was fraudulently inflated by $810,000, or 15% of the 2013 revenue reported by the OTC filing.

140.   The April 3, 2014 OTC filing also failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

141.   In a Form 10/A filed by Medbox with the SEC on May 13, 2014, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's annual revenues in 2012 and 2013. Medbox's 2012 revenue was fraudulently inflated by $561,000, or 22% of the 2012 revenue reported by the Form 10/A filing. Medbox's 2013 revenue was fraudulently inflated by $810,000, or 15% of the 2013 revenue reported by the Form 10/A filing.

142.   The May 13, 2014 Form 10/A filing also failed to identify the New-Age receivables purchase as a related party transaction, despite disclosing other related party transactions involving Mehdizadeh.

143.   In a Form 10-Q filed with the SEC on May 15, 2014, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's revenues in the first quarter of 2014. Medbox's first quarter 2014 revenue was fraudulently inflated by $1,150,000, or 89% of the revenue reported by the Form 10-Q filing.

144.   The May 15, 2014 Form 10-Q also falsely described the Benson and Denver deals as transactions with a "non-affiliated shareholder."

145.   In a Form 8-K filed with the SEC on May 16, 2014 that attached a press

release about Medbox's financial statements, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's revenues in the first quarter of 2014.  Medbox's first quarter 2014 revenue was fraudulently inflated by $1,150,000, or 89% of the revenue reported by the Form 8-K filing.

146.   In a Form 10-Q/A filed with the SEC on June 27, 2014, Medbox, Bedrick, and Mehdizadeh fraudulently overstated Medbox's revenues in the first quarter of 2014.  Medbox's first quarter 2014 revenue was fraudulently inflated by $1,150,000, or 89% of the revenue reported by the Form 10-Q/A filing.

147.   The June 27, 2014 Form 10-Q/A also falsely described the Benson and Denver deals as transactions with a "non-affiliated shareholder."

148.   Bedrick signed, as Medbox's chief executive officer, the company's July 15, 2013 Form S-1, November 13, 2013 Form S-1/A, January 21, 2014 Form 10, March 31, 2014 Form 10/A, May 13, 2014 Form 10/A, May 15, 2014 Form 10-Q, May 16, 2014 Form 8-K, and June 27, 2014 Form 10-Q/A.

149.   Mehdizadeh specifically controlled what Medbox filed and when Medbox made those filings, and consequently had ultimate authority over their substance and content.  Mehdizadeh also signed Medbox's July 15, 2013 Form S-1, November 13, 2013 Form S-1/A, April 3, 2014 Form 8-K, and April 3, 2014 OTC filing.

**2.     Fraudulently overstated revenues in Medbox press releases**

150.   From February 2013 through May 2014, Medbox issued press releases that materially overstated Medbox's revenues.

151.   In a press release dated February 11, 2013, Medbox materially overstated its revenue for first quarter 2013, claiming that "the company has generated over $900,000 in January 2013, which is a record revenue month for Medbox."  In reality, Medbox should have reported only $268,596 in revenue under GAAP for the first quarter of 2013.

152.   In a press release dated March 8, 2013, Medbox materially overstated its

revenue for first quarter 2013, again claiming that with revenue of "$900,000," the company had enjoyed in January 2013 its "[h]ighest revenue generating month in the company's history." In reality, Medbox should have reported only $268,596 in revenue under GAAP for the first quarter of 2013.

153. In a press release dated April 2, 2013, Medbox materially overstated its revenue for 2012 and the first quarter of 2013, claiming that its 2012 revenue was $3,525,636 and that its first quarter 2013 revenue was "well in excess of $2 million – a company record." In reality, Medbox should have reported only $1,176,829 and $268,596 in revenue under GAAP for 2012 and the first quarter of 2013, respectively.

154. In a press release dated April 15, 2013, Medbox materially overstated its revenue for the first quarter of 2013, claiming that "Medbox is proud to report that Q1 2013 was its highest revenue quarter in the company's history at more than $2 million booked as revenue." In reality, Medbox should have reported only $268,596 in revenue under GAAP for the first quarter of 2013.

155. In a press release dated May 22, 2013, Medbox materially overstated its revenue for the first quarter of 2013, claiming that its first quarter 2013 revenues had "increased 20% from [the] same period last year[…]to a record $1.749 million." In reality, Medbox should have reported only $268,596 in revenue under GAAP for the first quarter of 2013.

156. In a press release dated November 20, 2013, Medbox materially overstated its revenue for 2013, claiming that "[r]evenues surged to over $5.046 million through three quarters." In reality, Medbox should have reported only $2,062,083 in revenue under GAAP for 2013.

157. In a press release dated November 25, 2013, Medbox materially overstated its revenue for 2013, again claiming to have "posted record revenue figures for YTD 2013, amassing more than $5 million in consulting and equipment sales revenue through 9 months." In reality, Medbox should have reported only $2,062,083 in revenue under GAAP for 2013.

158.   In a press release dated April 1, 2014, Medbox materially overstated its revenue for 2013, claiming that "[f]ull-year revenues were $5.2 million, a 101.7% increase" compared to 2012.  In reality, Medbox should have reported only $2,062,083 in revenue under GAAP for 2013.

159.   In a press release dated May 15, 2014, Medbox materially overstated its revenue for the first quarter of 2014, claiming that its revenues for the quarter were $1.3 million.  In reality, Medbox should have reported only $51,011 in revenue under GAAP for the first quarter of 2014.

160.   With respect to the Medbox press releases described above, Mehdizadeh drafted each of the releases, and had ultimate authority over their substance and content.

161.   As Medbox's chief executive officer, Bedrick generally approved of the substance and content of the Medbox press releases described above, and was extensively quoted in every single one of them.  Upon information and belief, Bedrick had ultimate authority over the substance and content of these press releases.

### 3.   Material misrepresentations and omissions about the New-Age financing transaction in Medbox press releases

162.   In press releases dated February 19, 2013 and March 8, 2013, Medbox, made misleading statements about New-Age's 2013 stock purchase from Medbox.

163.   Medbox's February 19, 2013 press release asserted that the company had executed a "$6 million equity transaction" with a "private investment firm" that "specializes in funding up-and coming companies."  The release emphasized that the transaction represented a more "traditional funding source" and reported that Mehdizadeh had not liquidated any of his shares into the public market.

164.   Medbox's March 8, 2013 press release again claimed that the company had "[s]ecured a $6 million equity transaction with a private investment company."

165.   These statements were false and misleading because New-Age was not a private investment firm; rather, the entity was controlled by Mehdizadeh, and was in

fact solely funded by Mehdizadeh's transfer of 226,000 restricted shares of Medbox to New-Age for no consideration.

166.   With respect to the Medbox press releases described above, Mehdizadeh drafted each of the releases, and had ultimate authority over their substance and content.

167.   As Medbox's chief executive officer, Bedrick generally approved of the substance and content of the Medbox press releases described above, and was extensively quoted in both of them.  Upon information and belief, Bedrick had ultimate authority over the substance and content of these press releases.

### 4.   Material misrepresentations and omissions about Medbox's accounts receivable collections

168.   In a press release dated April 2, 2013, Medbox represented that "$1,535,00 in total receivables owed by Medbox clientele was paid in Q1 2013."

169.   In a press release dated April 15, 2013, Medbox represented that it had "reduced its receivables of $2,052,00 million dollars [sic] at year end 2012 and collected on $1,867,000."

170.   These releases were false and misleading because they omitted the material fact that these accounts receivable weren't being paid down by Medbox customers, but instead by New-Age, a shell entity formed by Mehdizadeh which he had funded through the undisclosed sale of restricted Medbox shares under his control.

171.   With respect to the Medbox press releases described above, Mehdizadeh drafted each of the releases, and had ultimate authority over their substance and content.

172.   As Medbox's chief executive officer, Bedrick generally approved of the substance and content of the Medbox press releases described above, and was extensively quoted in both of them.  Upon information and belief, Bedrick had ultimate authority over the substance and content of these press releases.

**D.      Medbox's Restatement of its Financial Statements**

173.    On March 11, 2015, Medbox filed restated financial statements for each of the years ended December 31, 2012 and December 31, 2013.

174.    On March 16, 2015, Medbox filed restated financial statements for the first nine months of 2014.

175.    In its restatement, Medbox reversed all revenue recognized in connection with New-Age's 2013 purchase of $1,371,000 in questionable Medbox accounts receivable.  Specifically, the restatement reversed $561,000 reported as revenue for the year-ended December 31, 2012, $810,000 in revenue reported for the year-ended December 31, 2013, and $810,000 in revenue reported in the first quarter of 2013.

176.    In its restatement, Medbox reversed all revenue recognized in the first quarter of 2014 in connection with the Benson and Denver deals transacted between Medbox and New-Age in spring 2014.  Specifically, the restatement reversed $1,150,000 in revenue reported in the first quarter of 2014 ($650,000 for the Benson deal and $500,000 for the Denver deal).

**E.      Mehdizadeh's and Bedrick's Role in the Frauds**

**1.      Mehdizadeh**

177.    Mehdizadeh knowingly and/or recklessly orchestrated the fraudulent scheme to inflate Medbox's revenue, and knowingly and/or recklessly misrepresented the truth about MedBox's finances in the company's public filings and press releases.

178.    In an email to Medbox's board, Mehdizadeh described his role at Medbox was as follows:  "As it pertains to me, I am Medbox.  It is me and I am it."

179.    Mehdizadeh was the architect of a scheme to materially inflate Medbox's reported revenues in violation of GAAP through sham transactions with New-Age.  In furtherance of the scheme, he used press releases to publicize Medbox's false financial results, with the intention of creating the false appearance that Medbox was unique among entrants in the marijuana sector because it had

generated real operating revenue, and had implemented a strong and transparent corporate governance environment within the company.

180.   To inflate Medbox's reported revenue, Mehdizadeh knowingly embarked on a sustained course of conduct in which he repeatedly engaged in deceptive acts, including:  surreptitiously funding New-Age by transferring Medbox shares that he controlled to the company; disguising his control of those Medbox shares by keeping them in the name of Spiro; fabricating documents to make it falsely appear that New-Age had actually paid real consideration for those shares, when it really hadn't; providing false information to the attorney drafting an opinion letter for New-Age so that New-Age could sell the shares – which were in fact restricted shares – and direct all sales proceeds back to him and Medbox; lying to Medbox's finance department and its auditor about his control of New-Age; signing false management representation letters; creating and circulating a false inter-office memo for the purpose of legitimizing the Benson deal; and lying to Medbox's finance department and its auditor about the Benson deal.

181.   Mehdizadeh was not only the architect of the scheme to inflate revenue with New-Age transactions, he reviewed and approved the content of each of the SEC and OTC filings and Medbox press releases at issue in this case.  He thus knew or was reckless in not knowing that these filings and press releases had materially misstated Medbox's reported revenue and misled investors about the true nature of the New-Age transactions.

182.   During the time period in which Medbox filed the materially inflated financial statements and issued the misleading press releases alleged above, Mehdizadeh unloaded 950,000 of his Medbox shares in private placements or through public sales for total sales proceeds of $6,014,048.

183.   As Medbox's chief executive officer and majority shareholder of Medbox, Mehdizadeh's knowledge or recklessness in connection with the frauds is imputed to the company.

2.    **Bedrick**

184.   Bedrick was also complicit in the fraud.  Specifically, he knowingly, recklessly or negligently misrepresented the truth about Medbox's finances in the company's public filings and press releases.

185.   Bedrick – Medbox's chief executive officer throughout the period in question – knew, or was reckless or negligent in not knowing, that Medbox's press releases, SEC filings and OTC filing had materially misstated Medbox's reported revenue and misled investors about the true nature of the New-Age transactions.

186.   Bedrick further acted unreasonably in approving the substance and content of the misrepresentations and omissions alleged above.

187.   Bedrick also knowingly, recklessly or negligently disregarded repeated and pervasive red flags demonstrating that revenue from the New-Age-related transactions should not have been recognized by Medbox, and allowed Mehdizadeh to continue the fraud uninterrupted.

188.   For example, in April 2013, shortly after New-Age engaged in an undisclosed sale of restricted Medbox shares controlled by Mehdizadeh, and then used those proceeds to buy Medbox stock (publicized by the company as a "$6 million private investment" by an unnamed investment firm), Bedrick warned Mehdizadeh that "ultimately people are going to know who gave us that 6 million." That was because Bedrick knew that New-Age was affiliated with Mehdizadeh and knew that Legaspi – the company's nominal chief executive officer – was Mehdizadeh's girlfriend.  In addition, when he and Mehdizadeh received an email accusing Medbox of illegally issuing shares through third-party entities, Bedrick wrote Mehdizadeh in an email:  "told you this guy knows more than you think."

189.   Yet Bedrick nonetheless authorized a February 19, 2013 press release falsely portraying the New-Age stock transaction as a bona fide investment by a firm that "specialized in funding up-and-coming companies."

190.   As for the $1.37 million in accounts receivable that Medbox falsely

claimed to have collected from customers, Bedrick knew that those receivables had in fact been purchased by Legaspi and New-Age.  Bedrick also knew of Mehdizadeh's intent to conceal that fact from Medbox's auditor.

191.   Bedrick nonetheless signed SEC filings in which that $1.37 million was reported as revenue, in violation of GAAP.

192.   As Mehdizadeh's and Medbox's scheme was occurring, Mehdizadeh offered to pave the way for Bedrick to leave the company in June 2013, writing in an email, "Sometimes creative financing is necessary to fund start-ups and I am at peace with that.  On the other hand, you have a wife and kids to contend with so for you these matters take on a different meaning and may simply be too much for you to reconcile."  Mehdizadeh offered to sign an agreement indemnifying Bedrick and holding him harmless.  Rather than stopping, or at a minimum, confronting Mehdizadeh about the New-Age scheme, Bedrick stayed on as the company's chief executive officer.

193.   With respect to the 2014 Benson and Denver transactions, Bedrick knew of Mehdizadeh's disagreement with Medbox's finance department and auditor over their accounting treatment, and did nothing.  Bedrick also knew that Mehdizadeh was likely involved in funding the Benson deal because Mehdizadeh informed Bedrick in a January 2014 text message that he was going to have to fund the deal.  Bedrick took no action despite knowing of New-Age's undisclosed affiliation with Mehdizadeh.  He also knew and understood that the Denver deal made no economic sense from New-Age's standpoint.

194.   Bedrick nonetheless signed SEC filings in which the $1.15 million associated with the Benson and Denver deals was reported as revenue, in violation of GAAP.

195.   Between April 2013 and October 2014, Bedrick sold 711,492 of his shares of Medbox stock in private placements or through public sales for total sales proceeds of $6,483,180.

**F.    Medbox's Reporting, Books and Records and Internal Controls Violations**

196.    Mehdizadeh orchestrated the New-Age transactions and specifically pushed for New-Age related revenue to be included in Medbox's SEC filings even though he knew the truth about those transactions.

197.    Mehdizadeh accordingly provided substantial assistance in Medbox's materially false SEC filings, namely the company's May 15, 2014 Form 10-Q for the first quarter of 2014, June 27, 2014 Form 10-Q/A for the first quarter of 2014, April 3, 2014 Form 8-K announcing Medbox's 2013 year-end results, and May 16, 2014 Form 8-K announcing Medbox's first quarter of 2014 results.

198.    Medbox kept books and records that did not accurately reflect the accounts receivable and related-party transactions alleged above – for example, Medbox falsely booked New-Age's accounts receivable purchase as payments by the customers associated with those receivables.

199.    By orchestrating the New-Age transactions, Mehdizadeh substantially assisted in Medbox's failure to make and keep books and records accurately and fairly reflecting its transactions and assets.

200.    Medbox further failed to implement sufficient controls to ensure the proper recognition of revenue and identification of related-party transactions.

201.    In order to perpetrate the scheme to inflate Medbox's revenues through related-party transactions with New-Age, Mehdizadeh forced Medbox's internal and external accounting personnel to rely on him to obtain information about the transactions.  Consequently, Mehdizadeh substantially assisted in Medbox's failure to implement sufficient internal controls.

202.    Bedrick, at a minimum, recklessly disregarded repeated and pervasive red flags demonstrating that revenue from the New-Age-related transactions should not have been recognized, and allowed Mehdizadeh to continue the fraud uninterrupted.

203.    Bedrick therefore substantially assisted Medbox's materially false SEC

1  filings, namely the company's May 15, 2014 Form 10-Q for the first quarter of 2014,
2  June 27, 2014 Form 10-Q/A for the first quarter of 2014, April 3, 2014 Form 8-K
3  announcing Medbox's 2013 year-end results, and May 16, 2014 Form 8-K
4  announcing Medbox's first quarter of 2014 results.

5  **G.    Mehdizadeh's and Bedrick's Lies to Medbox's Auditors**

6       204.    Mehdizadeh misled Medbox's auditor in connection with his 2012, 2013
7  and first quarter 2014 audit or quarterly review work when he signed January and
8  March 2014 management representation letters falsely representing that:  (i)
9  Medbox's financial statements were fairly presented in conformity with GAAP; (ii)
10 there were no material transactions that had not been properly recorded in the books
11 and records underlying the financial statements; (iii) he had no knowledge of any
12 fraud or suspected fraud involving Medbox's management that would have a material
13 effect on the company's financial statements; and (iv) related-party transactions and
14 related accounts receivable or payable had been properly recorded or disclosed in the
15 financial statements.

16      205.    Mehdizadeh knew that the foregoing statements and omissions to
17 Medbox's auditors were false and did not make those false statements and omissions
18 through ignorance, mistake, or accident.

19      206.    Mehdizadeh further acted unreasonably in making those false statements
20 and omissions to Medbox's auditors.

21      207.    Bedrick misled Medbox's auditor in connection with his audit of the
22 financial statements filed with Medbox's January 21, 2014 Form 10, March 31, 2014
23 Form 10/A, May 13, 2014 Form 10/A, May 15, 2014 Form 10-Q, and June 27, 2014
24 Form 10-Q/A when he signed March and May 2014 management representations
25 letters falsely representing that he had no knowledge of any fraud or suspected fraud
26 involving management or allegations of fraud or suspected fraud affecting the
27 company.

28      208.    Bedrick knew, or was reckless in not knowing, that the foregoing

COMPLAINT                                     34

statements and omissions to Medbox's auditors were false and did not make those false statements and omissions through ignorance, mistake, or accident.

209.   Bedrick further acted unreasonably in making those false statements and omissions to Medbox's auditors.

**H.   Bedrick's False SOX Certifications**

210.   In accordance with Section 302 of SOX and Exchange Act Rule 13a-14, Bedrick signed certifications which Medbox attached to its May 15, 2014 Form 10-Q and June 27, 2014 Form 10-Q/A for the first quarter of 2014.

211.   In his certification, Bedrick falsely represented that the report did not contain any untrue statement or omission of a material fact and that the financial statements in the report fairly presented in all material respects the financial condition and results of the operation of the issuer.

212.   Bedrick knew, or was reckless in not knowing, that his SOX certifications were materially false and misleading, and he acted unreasonably in making those certifications.

213.   That is because at the time he signed those SOX certifications, Bedrick not only knew of potential fraud involving Mehdizadeh, but was also aware of clear and repeated red flags indicating that Medbox's New-Age-related transactions were a sham.

214.   Bedrick knew that the Benson and Denver deals were included in the revenue reported in the first quarter 2014 filings that he certified.  In fact, in February 2014 Bedrick specifically asked Mehdizadeh what Medbox's revenues for the first quarter would look like without a deal for the Benson dispensary.

**I.   Bedrick's Stock Sales During the SOX Section 304 Period**

215.   Medbox was required to prepare an accounting restatement of its Form 10 and its first quarter 10-Q as a result of Bedrick's and/or Mehdizadeh's misconduct, as alleged above.

216.   Bedrick realized profits from the sale of Medbox's stock during the

statutory time periods set forth in SOX Section 304(a), which are the 12-month periods following Medbox's filing of the reports for which a restatement was required as a result of misconduct: here, (i) January 21, 2014 to January 21, 2015 (corresponding to Medbox's restatement of its January 21, 2014 Form 10); and (ii) May 15, 2014 to May 15, 2015 (corresponding to Medbox's restatement of its May 15, 2014 Form 10-Q).

217. During the statutory time periods established by SOX Section 304(a), Bedrick sold 1,353,692 shares of Medbox for a total profit of $4,475,924.73.

218. Bedrick has not reimbursed Medbox for the profits realized from the sale of Medbox's stock that he received or obtained during the statutory time periods established by SOX Section 304(a).

219. The SEC has not exempted Bedrick, under SOX Section 304(b), from the application of SOX Section 304(a).

**J.    Medbox, Mehdizadeh, New-Age and Legaspi's Offer and Sale of Securities Without Registration or Exemption**

**1.    Unregistered offer and sale of the 226,000 shares Mehdizadeh transferred to New-Age**

220. In February 2013, New-Age began selling the 226,000 Medbox shares it received from Mehdizadeh in December 2012 to four different entities in private transactions.

221. By April 2013, New-Age had sold all 226,000 shares for sales proceeds of more than $3.1 million.

222. New-Age transferred the shares to the entities without restrictive legends even though the securities were restricted securities.

223. The entities that purchased the shares almost immediately sold them into the market.

224. Mehdizadeh indirectly sold the 226,000 shares through New-Age or was a necessary participant and substantial factor in the New-Age stock sales because he:

(i) controlled the 226,000 shares and caused them to be transferred to New-Age, even though they were held in the name of Spiro; (ii) drafted documents that made it falsely appear that New-Age had purchased the 226,000 shares; (iii) secured an attorney opinion letter that was based on false information about how New-Age had come to acquire the shares; (iv) was involved in communications with a broker purportedly advising New-Age about the sales; and (v) directly benefited from the stock sale proceeds because they were used to fund his purchase of a home.

225.   Legaspi also indirectly sold the shares through New-Age or was a necessary participant and substantial factor in the New-Age stock sales because she: (i) communicated directly with some of the purchasers, including making payment demands for the shares; (ii) signed the stock purchase agreements, on New-Age's behalf, that New-Age entered into with the purchasers of the 226,000 shares; (iii) paid all associated transfer agent fees out of a New-Age bank account in which she had signatory authority; (iv) received the stock sale proceeds through New-Age's bank account; and (v) funneled the stock sale proceeds out of the New-Age bank account to either Medbox or Mehdizadeh.

226.   These stock sales were made through interstate commerce because they involved the use of email and the wiring of funds to New-Age's bank account.

227.   New-Age, Legaspi, and Mehdizadeh did not file a registration statement with the SEC for the transactions through which the 226,000 shares were sold.

228.   Medbox and New-Age were both controlled by Mehdizadeh. Mehdizadeh and New-Age were, therefore, issuers in the context of the foregoing private sales.

229.   Mehdizadeh and New-Age also acted as underwriters because they acquired the 226,000 shares with a view to distribution.  Shortly after receiving the shares from Mehdizadeh, New-Age began selling them in private transactions to entities who sold them into the market.  New-Age used nearly all of the proceeds from the sale for Mehdizadeh's benefit or to fund Medbox.

230.   Mehdizadeh, New-Age, and Legaspi accordingly engaged in the offer and sale of unregistered securities, and the offers and sales were not exempt from registration.

## 2.   Unregistered offers and sales by Mehdizadeh and Medbox through private placements

231.   After forming New-Age in July 2012, Mehdizadeh operated a boiler room at Medbox's headquarters from July 2012 through late December 2012 which sold Medbox shares over the phone to investors that Mehdizadeh had identified by buying lead lists, and with whom the company had no pre-existing relationship.

232.   In the course of operating the boiler room, Mehdizadeh:  hired salespeople to conduct cold calls out of the boiler room; approved the script that his salesmen used during their cold call campaign; purchased and distributed lead lists to the sale personnel; set the price at which the salespeople sold Medbox shares; paid the sales staff a salary and commissions based on how much Medbox stock they sold; and directly communicated with some of the investors about their investment in Medbox.

233.   Mehdizadeh also sought to hide Medbox's connection to the boiler room by having New-Age nominally employ one of his salesmen.

234.   Medbox took no apparent steps to determine whether its investors were actually accredited.

235.   Medbox sold shares to unaccredited investors.

236.   Medbox publicly stated in SEC and OTC filings that it did not engage in general solicitation or advertising to sell securities.

237.   Even after these boiler room operations ended, Medbox continued to sell its shares in private placements through February 2014.

238.   Between July 2012 and February 2014, Medbox sold over 3 million shares in private placements for stock sales proceeds of over $8.9 million.

239.   These stock sales were made through interstate commerce because they

involved the solicitation of investors over the phone, the use of email, and the wiring of funds to Medbox's bank account.

240.   Medbox did not register with the SEC any of the securities that Medbox and Mehdizadeh offered or sold in the foregoing private placements.

241.   Medbox and Mehdizadeh accordingly engaged in the offer and sale of investments without Medbox registering those securities with the SEC, and the offers and sales were not exempt from registration.

**K.   Mehdizadeh's Illegal Broker-Dealer Activities**

242.   Mehdizadeh acted as an unregistered broker by operating a boiler room.

243.   Mehdizadeh ran a sales force directed at actively soliciting investors to purchase Medbox stock.

244.   He set the price at which the sales force sold the stock, and paid them commissions.

245.   Mehdizadeh also controlled the issuance of the Medbox shares to investors by receiving and processing subscription agreements from investors, directing lawyers to draft board resolutions approving the issuances, and communicating with the transfer agent about the issuances.

246.   Accordingly, Mehdizadeh regularly participated in Medbox's offer and sale of securities at key points in the chain of distribution.

247.   Mehdizadeh was not associated with a registered broker or dealer at the time of the foregoing misconduct.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Medbox and Mehdizadeh)**

248.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

249.   As alleged above, Mehdizadeh knowingly engaged in a fraudulent

scheme to inflate Medbox's revenues and misrepresented or omitted material information about the company's finances in its public filings and press releases. In particular, and as alleged in more detail above, he knowingly orchestrated and funded each of the New-Age-related transactions for the purpose of inflating Medbox's reported revenue in financial statements filed with the SEC and the OTC, and in press releases which he drafted and authorized. Mehdizadeh knew that the accounts receivable purchased by New-Age in 2013 were uncollectible. And he was keenly aware of the revenue-related problems associated with the Benson and Denver deals in light of the concerns raised by Medbox's internal and external accountants, who Mehdizadeh instead chose to affirmatively mislead.

250. By engaging in the conduct described above, Defendants Medbox and Mehdizadeh, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

251. Defendants Medbox and Mehdizadeh knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

252. By engaging in the conduct described above, Defendants Medbox and Mehdizadeh violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17

C.F.R. §§ 240.10b-5.

## SECOND CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against Defendant Bedrick)**

253.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

254.   As alleged above, Bedrick knowingly and/or recklessly misrepresented or omitted material information about Medbox's finances in its public filings and press releases.  In particular, and as alleged in more detail above, he signed Medbox's SEC filings and reviewed and approved Medbox press releases that materially misstated the company's reported revenues and further misrepresented the true nature of Medbox's transactions with New-Age.  He did so despite his knowledge or reckless disregard of serious red flags about the legitimacy of those transactions.

255.   By engaging in the conduct described above, Defendant Bedrick, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

256.   Defendant Bedrick knew, or was reckless in not knowing, that he made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

257.   By engaging in the conduct described above, Defendant Bedrick violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(1), (2) and (3) of the Securities Act**

**(against Defendants Medbox and Mehdizadeh)**

258.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

259.   As alleged above, Mehdizadeh knowingly engaged in a fraudulent scheme to inflate Medbox's revenues and misrepresented or omitted material information about the company's finances in its public filings and press releases.  In particular, and as alleged in more detail above, he knowingly orchestrated and funded each of the New-Age-related transactions for the purpose of inflating Medbox's reported revenue in financial statements filed with the SEC and the OTC, and in press releases which he drafted and authorized.  Mehdizadeh knew that the accounts receivable purchased by New-Age in 2013 were uncollectible.  And he was keenly aware of the revenue-related problems associated with the Benson and Denver deals in light of the concerns raised by Medbox's internal and external accountants, who Mehdizadeh instead chose to affirmatively mislead.

260.   By engaging in the conduct described above, Defendants Medbox and Mehdizadeh, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

261.   Defendants Medbox and Mehdizadeh knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud; and knew, or

were reckless in not knowing, that they engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser, and they acted unreasonably under the circumstances in doing so.

262.   By engaging in the conduct described above, Defendants Medbox and Mehdizadeh violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendant Bedrick)

263.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

264.   As alleged above, Bedrick knowingly and/or recklessly misrepresented or omitted material information about Medbox's finances in its public filings and press releases.  In particular, and as alleged in more detail above, he signed Medbox's SEC filings and reviewed and approved Medbox press releases that materially misstated the company's reported revenues and further misrepresented the true nature of Medbox's transactions with New-Age.  He did so despite his knowledge, or reckless or negligent disregard, of serious red flags about the legitimacy of those transactions.

265.   By engaging in the conduct described above, Defendant Bedrick directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

266. Defendant Bedrick knew, or was reckless in not knowing, that he made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and he acted unreasonably under the circumstances in doing so.

267. By engaging in the conduct described above, Defendant Bedrick violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### Lying to Auditors

### Violations of Rule 13b2-2 of the Exchange Act

### (against Defendants Mehdizadeh and Bedrick)

268. The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

269. As alleged above, Mehdizadeh knowingly misled Medbox's auditor in connection with his 2012, 2013, and first quarter 2014 audit or quarterly review work by signing management representation letters which falsely represented that:  (i) Medbox's financial statements were fairly presented in conformity with GAAP; (ii) there were no material transactions that had not been properly recorded in the books and records underlying the financial statements; (iii) he had no knowledge of any fraud or suspected fraud involving Medbox's management that would have a material effect on the company's financial statements; and (iv) related-party transactions and related accounts receivable or payable had been properly recorded or disclosed in the financial statements.  Mehdizadeh also misled Medbox's auditor during quarterly review work for the first quarter of 2014 when he lied about New-Age's status as a related party and about Medbox's build out work in connection with the Benson deal.

270. As alleged above, Bedrick knowingly misled Medbox's auditor when he signed management representation letters, in connection with the audit of Medbox's

Form 10 and first quarter 2014 Form 10-Q filings, which falsely represented that he had no knowledge of any fraud or suspected fraud involving management or allegations of fraud or suspected fraud affecting the company.

271.   By engaging in the conduct described above, Defendants Mehdizadeh and Bedrick, directly or indirectly:  (1) made or caused to be made a materially false or misleading statement to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the Commission; or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the Commission.

272.   Defendant Mehdizadeh knew, or was reckless in not knowing, his statements to Medbox's auditor were materially false and misleading.  Mehdizadeh further acted unreasonably in making the foregoing statements to Medbox's auditor.

273.   Defendant Bedrick knew, or was reckless in not knowing, that his statements and omissions to Medbox's auditors were materially false and misleading.  Bedrick further acted unreasonably in making the foregoing statements to Medbox's auditor.

274.   By engaging in the conduct described above, Defendants Mehdizadeh and Bedrick violated, and unless restrained and enjoined will continue to violate Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIXTH CLAIM FOR RELIEF

### False SOX Certification

### Violation of Rule 13a-14 of the Exchange Act

### (against Defendant Bedrick)

275.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

276.   As alleged above, Defendant Bedrick signed certifications of Medbox's May 15, 2014 first quarter Form 10-Q and June 27, 2014 first quarter Form 10-Q/A in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder.  Those certifications were false because Bedrick represented that the reports did not contain any untrue statement or omission of material facts and the financial statements in the report fairly presented in all material respects the financial condition and results of the operations of the issuer.  At the time he signed the certifications, Bedrick was aware of a potential fraud involving Mehdizadeh and of significant issues associated with the New-Age related transactions.

277.   By engaging in the conduct described above, Defendant Bedrick, as Medbox's chief executive officer, falsely certified a periodic report containing financial statements filed by an issuer in accordance with Exchange Act Section 13(a).

278.   By engaging in the conduct described above, Defendant Bedrick violated, and unless restrained and enjoined will continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## SEVENTH CLAIM FOR RELIEF

### Reporting Violations

### Section 13(a) of the Exchange Act and Rules 12b-20,

### 13a-11, and 13a-13 thereunder

### (against Defendant Medbox)

279.   The SEC realleges and incorporates by reference paragraphs 1 through

247 above.

280.   As alleged above, Medbox filed false and misleading Forms 10-Q and 10-Q/A for the first quarter of 2014 and two Forms 8-K attaching press releases announcing Medbox's year-end 2013 financial results and first quarter 2014 financial results.  These filings were false and misleading because they materially overstated Medbox's revenues and contained material misrepresentations about the transactions involving New-Age.

281.   By filing materially false and misleading periodic reports, including quarterly and current reports on Forms 10-Q and 8-K in 2014, Medbox violated, and unless restrained and enjoined, will continue to violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13.

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Medbox's Reporting Violations
### (against Defendants Mehdizadeh and Bedrick)

282.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

283.   As alleged above, Medbox violated Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13, and 12b-20 thereunder by filing false and misleading Forms 10-Q and 10-Q/A for the first quarter of 2014 and two Forms 8-K announcing Medbox's year-end 2013 financial results and first quarter 2014 financial results.

284.   As alleged above, Mehdizadeh provided substantial assistance in the commission of the foregoing reporting violations because he knowingly orchestrated the underlying transactions with New-Age for the specific purpose of reporting New-Age-related revenue in Medbox's false SEC filings.

285.   As alleged above, Bedrick substantially assisted in the reporting violations by recklessly disregarding repeated red flags demonstrating problems with New-Age-related revenue, and thus allowed Mehdizadeh to continue perpetrating the

fraud.

286.   By engaging in the conduct described above, Defendants Mehdizadeh and Bedrick have aided and abetted, and unless restrained and enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13.

## NINTH CLAIM FOR RELIEF

### Books and Records Violations

### Section 13(b)(2)(A) of the Exchange Act

### (against Defendant Medbox)

287.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

288.   As alleged above, Medbox booked payments from New-Age in connection with its purchase of Medbox's questionable accounts receivable as payments by its customers, rather than New-Age.  In addition, Mehdizadeh created a Medbox record – in the form of an interoffice memo and email to accounting – that falsely described the Benson deal.

289.   By failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets, Medbox violated, and unless restrained and enjoined, will continue to violate, Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §78m(b)(2)(A).

## TENTH CLAIM FOR RELIEF

### Internal Controls Violations

### Section 13(b)(2)(B) of the Exchange Act

### (against Defendant Medbox)

290.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

291.   As alleged above, Medbox failed to implement sufficient internal

accounting controls to ensure recognition of revenue in accordance with GAAP and the identification of related party transactions.

292.   By failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets, Medbox violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §78m(b)(2)(B).

## ELEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of

### Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

### (against Defendant Mehdizadeh)

293.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

294.   As alleged above, Medbox kept books and records that did not accurately reflect receivables and related-party transactions with New-Age.  Further, Medbox failed to implement sufficient internal accounting controls to ensure the proper recognition of revenue and identification of related-party transactions. Because Mehdizadeh orchestrated the New-Age transactions, provided false information to Medbox's internal and external accountants in connection with those transactions, and created a controls environment which made Medbox's internal and external accounting personnel completely reliant on Mehdizadeh for information about revenue generating transactions, Mehdizadeh substantially assisted in the falsification of Medbox's books and records and the company's failure to implement effective internal controls.

295.   By reason of the conduct described above, Defendant Mehdizadeh knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Medbox in its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (B).

296.   By engaging in the conduct described above, Defendant Mehdizadeh aided and abetted, and unless restrained and enjoined, is reasonably likely to continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (B).

## TWELFTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Mehdizadeh, Medbox, New-Age and Legaspi)

297.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

298.   As alleged above, Mehdizadeh, New-Age, and Legaspi each, directly or indirectly, offered or sold the 226,000 Medbox shares transferred by Mehdizadeh to New-Age at the end of 2012 in unregistered transactions during spring 2013.  As further alleged above, Mehdizadeh and Medbox each, directly or indirectly, offered or sold unregistered Medbox securities in private placements between July 2012 and February 2014.

299.   By engaging in the conduct described above, Defendants Mehdizadeh, Medbox, New-Age, and Legaspi, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

300.   By engaging in the conduct described above, Defendants Mehdizadeh, Medbox, New-Age, and Legaspi violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) &

77e(c).

## THIRTEENTH CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violation of Section 15(a) of the Exchange Act

### (against Defendant Mehdizadeh)

301.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

302.   As alleged above, Mehdizadeh acted as an unregistered broker by operating a boiler room to sell Medbox shares.

303.   By engaging in the conduct described above, Defendant Mehdizadeh made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

304.   By engaging in the conduct described above, Defendant Mehdizadeh has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## FOURTEENTH CLAIM FOR RELIEF

### Failure to Reimburse Incentive Compensation

### Violations of Section 304 of the Sarbanes-Oxley Act

### (against Defendant Bedrick)

305.   The SEC realleges and incorporates by reference paragraphs 1 through 247 above.

306.   As alleged above, Medbox filed a Form 10/A and Form 10-Q for the first quarter of 2014 that was in material noncompliance with financial reporting requirements under the securities law and GAAP.

307.   Due to Medbox's material non-compliance with its financial reporting requirements under the securities laws and GAAP, and as a result of Bedrick's and/or Mehdizadeh's misconduct, Medbox was required to prepare accounting restatements, which it filed in March 2015, of Medbox's financial results for each of the years ended December 31, 2012 and December 31, 2013, and for the first nine months of 2014.

308.   Defendant Bedrick, by engaging in the conduct described above, failed to reimburse the issuer, Medbox, for any profits he realized from the sale of Medbox securities during the 12-month period after Medbox filed reports for which a restatement was required as a result of misconduct.

309.   The SEC has not exempted Bedrick, in accordance with Section 304(b) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(b), from the application of Section 304(a) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a).

310.   By engaging in the conduct described above, Defendant Bedrick has violated, and unless ordered to comply will continue to violate, Section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Medbox, Mehdizadeh, Bedrick, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15

U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Medbox, Mehdizadeh, New-Age, Legaspi, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Mehdizadeh and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

### V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Mehdizadeh and Bedrick, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

### VI.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Bedrick, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Rule 13a-14 of the Exchange Act [17

C.F.R. § 240.13a-14].

## VII.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Mehdizadeh and Bedrick, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting any violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-11, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13].

## VIII.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Mehdizadeh, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting any violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## IX.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## X.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## XI.

Enter an order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and/or Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)],

prohibiting Mehdizadeh and Bedrick from acting as an officer or director of any issuer that has a class of securities registered in accordance with Section 12 of the Exchange Act [15 U.S.C. §78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)].

## XII.

Enter an order, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. §78u(d)(2)], prohibiting Mehdizadeh and Bedrick from participating in any offering of penny stock.

## XIII.

Order Bedrick to reimburse Medbox for the profits realized from the sale of Medbox's stock that he received or obtained during the statutory time periods established by SOX Section 304(a).

## XIV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XV.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  March 9, 2017

/s/ Gary Y. Leung
_____
GARY Y. LEUNG
MEGAN M. BERGSTROM
Attorneys for Plaintiff
Securities and Exchange Commission